# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHUONG DOAN, et al., | CASE NO. 04cv2039 DMS (RBB) |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | |
| | [Docs. 294, 304-309] |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court are Plaintiffs' motion for summary judgment and Defendant's six motions for summary judgment against each class representative. The matter came on for hearing on February 19, 2010. Alexandra Manbeck and Hung Le appeared on behalf of Plaintiffs. Dianne Schweinner and Raven Norris appeared on behalf of Defendant. For the reasons set forth below, the Court denies Plaintiffs' motion for summary judgment and grants Defendant's motions for summary judgment.

## I.

## PROCEDURAL BACKGROUND

On October 12, 2004, Plaintiffs filed a complaint against the Commissioner of the Social Security Administration ("SSA") alleging that Administrative Law Judge ("ALJ") Steven New was

biased against applicants who sought social security benefits.[1]  (Doc. 1.)  Steven New served as an ALJ for the SSA for approximately six years.  He separated from the SSA in May 2003 and is now deceased.  This Court has jurisdiction over the matter pursuant to the Social Security Act, 42 U.S.C. § 405(g).  (April 11, 2005 Order at 4-6.)  The case previously was assigned to the Honorable Napolean A. Jones Jr., who decided many of the procedural motions.

The original complaint named Phuong Doan as the class representative.  Plaintiffs thereafter sought to amend the complaint to add Jose Hernandez, Dieu Lam, and Hai Huynh as class representatives.  (Doc. 21.)  On January 23, 2006, Judge Jones granted the motion as to Jose Hernandez only.  (Jan. 23, 2006 Order.)  On August 21, 2006, the matter was certified as a class action, and on March 5, 2007, the class definition was modified as follows:

> All claimants for Title II Social Security Disability Benefits or Title XIV Supplemental Security Income whose claims had been assigned to ALJ New and have had their claims denied or dismissed by ALJ New, except that the class shall not include any person who has prosecuted any action in federal court in which the issue of ALJ New's alleged bias or predisposition to deny claims was addressed and determined.

(March 5, 2007 Order at 10.)

On January 29, 2008, Judge Jones dismissed Plaintiffs Phuong Doan and Jose Hernandez as class representatives on res judicata grounds.  (Jan. 29, 2008 Order at 8-9.)  On April 9, 2009, Judge Jones granted Plaintiffs' motion for leave to file a Second Amended Complaint ("SAC") and add additional class representatives.  (Doc. 185.)  Currently, the named class representatives are: Ethel Gutierrez, Karen Kraintz, Hoa Nguyen, Shelby Mittner, Sandor Hejja, and Vien Mai.  They represent a class of approximately 886 applicants, all of whom were denied social security benefits by ALJ New.  On April 16, 2009, the case was reassigned to this Court.

Plaintiffs allege that ALJ New was biased against Title II and Title XIV applicants and was predisposed to deny as many of their claims as possible.  (SAC ¶ 2.)  Plaintiffs allege the ALJ used improper procedural devices and routinely ignored the law in order to deny claims.  (*Id.*)  Plaintiffs further allege that ALJ New: (1) questioned applicants in a leading manner to obtain uninformed

---

[1] When the complaint initially was filed, Jo Ann Barnhart was the Commissioner of the SSA. Thereafter, Michael J. Astrue became Commissioner and was substituted as the named Defendant.

admissions and routinely screamed and yelled at claimants; (2) used inordinate time to cross-examine claimants, thereby precluding counsel from developing the record and their client's testimony; (3) interrupted expert witnesses and family members who were giving testimony favorable to the claimant; (4) disparaged claimants' treating physicians and employed unqualified experts; (5) omitted favorable evidence from written opinions; (6) routinely found claimants not credible; (7) accused claimants of malingering; (8) delayed resolution of cases that were favorable to claimants; (9) debased and intimidated claimants and their attorneys; (10) created an atmosphere of fear for claimants; and (11) routinely ignored the law in order to deny valid claims. (*Id.* at ¶ 5(i)-(xi).)

Through this litigation, Plaintiffs seek a declaration that ALJ New was biased against the class and that Plaintiffs were deprived of their right to a fair hearing before an impartial judge. Plaintiffs seek new hearings on all their social security applications. (*Id.* at 9.)

On October 17, 2009, Plaintiffs filed a motion for summary judgment. (Doc. 294.) Defendant filed an opposition, (Doc. 322), and Plaintiffs filed a reply. (Doc. 323.) On November 9, 2009, Defendant filed six separate motions for summary judgment against each of the named class representatives. (Docs. 394-309.) Plaintiffs filed oppositions, (Docs. 325-351), and Defendant filed replies. (Docs. 357-362.)

## II.

## FACTUAL BACKGROUND

The SSA application history of each class representative is relevant to the issues addressed in this Order. The following is a brief summary of each representative's history before the SSA.

*Ethel Gutierrez*. Ethel Gutierrez filed her first application for disability insurance benefits on February 3, 1998. The application was denied by the Agency. (Anderson Decl. ¶ 3; Def. Ex. L.) She filed another application on October 22, 1999, alleging a disability onset date of April 16, 1999. (Zuroff Decl. ¶ 4.) Gutierrez requested a hearing on the application, which was held on November 8, 2001, before ALJ New. (Def. Ex. M.) Gutierrez was represented by attorney Anthony DeLellis. (*Id.*) ALJ New denied her application on December 27, 2001. (*Id.*) Gutierrez appealed the decision, but at the same time filed a new application for disability benefits. The new application was filed on August 9, 2002, and was granted by the Agency. (Anderson Decl. ¶¶ 6-7.) The Appeals Council

reviewed both ALJ New's initial denial, and the Agency's subsequent grant of benefits. (Def. Ex. N.) The Appeals Council expressed concern about the evidence relied on for the grant of the 2002 application and thus, ordered further proceedings to determine the exact nature of Gutierrez' mental impairments. (*Id.*) ALJ Carletti conducted a hearing on September 6, 2006, and issued a decision in favor of Gutierrez. (Def. Ex. O.) ALJ Carletti found that Guiterrez had mental impairments dating back to May 2, 2001, which combined with physical impairments to render Gutierrez unable to work. (*Id.* at 2.)

*Hoa Nguyen*. Hoa Nguyen filed an application for supplemental income on March 23, 2000. The application was denied, and Nguyen requested a hearing. A hearing was held in front of ALJ New on March 9, 2001, at which time Nguyen was represented by attorney Michael Earle. (Def. Ex. U.) ALJ New denied her application on August 6, 2001. (*Id.*) Nguyen appealed the decision, first to the Appeals Council and then to the district court. (Def. Exs. V & W.) Attorney Matty Sandoval represented Nguyen in the district court action, *Nguyen v. Barnhart*, 02cv0329 JM (LSP) (S.D. Cal. 2002). The court found that ALJ New's findings were supported by substantial evidence. (Def. Ex. X.) Subsequently, Nguyen filed another application for benefits on May 3, 2005, which was denied by the agency. (Def. Ex. Y.) She filed a third application on May 31, 2005, which was granted due to her age. (Anderson Decl. ¶ 9.)

*Karen Kraintz*. Ms. Kraintz filed applications for disability and supplemental benefits in July 1995, which were denied by ALJ Durso. (Def. Ex. AE.) She filed another application which was denied by the Agency on June 18, 1999. (Def. Ex. AF.) On December 6, 2000 and January 12, 2001, Kraintz filed additional applications. ALJ New held a hearing on the applications on December 13, 2002. (Def. Ex. AI.) Kraintz was represented at the hearing by attorney Vincent Jackson. (*Id.*) ALJ New denied Kraintz' application on April 24, 2003. (*Id.*) Kraintz appealed the decision, first to the Appeals Council and then to the district court. (Def. Exs. AJ, AK.) Attorney Manuel Serpa represented Kraintz in the district court action, *Kraintz v. Barnhart*, 04cv1708 DMS (JMA) (S.D. Cal. 2004). The court found that ALJ New's findings were supported by substantial evidence. (Def. Ex. AL.) Kraintz filed another application on November 25, 2005. The application was initially denied, but then granted on reconsideration. (Anderson Decl. ¶ 8.)

1      *Shelby Mittner*.  Ms. Mittner was a minor at the time of her applications, which were filed

2  through her mother, Amy Garcia.  She filed an application for supplemental income on September 24,

3  1996, which was denied.  (Def. Ex. AT at 2.)  She filed another application June 26, 2001, which was

4  denied initially and on reconsideration.  (Def. Exs. AR-AT.)  She requested a hearing, and received

5  one in front of ALJ New on October 2, 2002.  (Def. Ex. AT.)  Mittner was not represented by an

6  attorney.  (*Id.*)  ALJ New denied Mittner's application on November 22, 2002.  (*Id.*)  Mittner appealed,

7  both to the Appeals Council and the district court.  (Def. Exs. AU-AV.)  Attorney Mary Mitchell

8  represented Mittner in the district court action, *Mittner v. Barnhart*, 03cv1143 W (JAH) (S.D. Cal.

9  2003.)  In that matter, the SSA stipulated to remand Mittner's claim for a new hearing.  (Def. Ex.

10  AW.)  The matter was heard on February 18, 2005, before ALJ Steinman.  (Def. Ex. AX.)  At the

11  hearing, Mittner amended her disability onset date to January 31, 2003.  (*Id.*)  On March 23, 2005, ALJ

12  Steinman issued a favorable decision using the amended disability onset date.  (*Id.*)

13      *Sandor Hejja*.  Sandor Hejja filed an application for disability benefits on April 11, 2001.  The

14  application was denied initially and on reconsideration, and Hejja requested a hearing.  (Def. Exs. BE-

15  BG.)  The hearing was held on April 19, 2002, before ALJ New.  (Def. Ex. BG.)  Hejja was not

16  represented by an attorney.  (*Id.*)  ALJ New denied the application on June 25, 2002.  (*Id.*)  Hejja

17  appealed, and the Appeals Council remanded the matter in light of new evidence.  (Def. Ex. BH.)  On

18  March 3, 2003, ALJ Steinman conducted a telephonic hearing and ordered additional examinations.

19  (Def. Ex. BI.)  On August 25, 2003, ALJ Steinman again denied Hejja's claim.  (*Id.*)  Hejja appealed

20  the decision, both to the Appeals Council and the district court.  (Def. Exs. BJ, BM.)  Attorney Mary

21  Mitchell represented Hejja in the district court action, *Hejja v. Barnhart*, 04cv0141 JM (JFS) (S.D.

22  Cal. 2004.)  While that matter was pending, Hejja filed another application with SSA which was

23  denied initially and on reconsideration.  (Def. Exs. BK, BL.)  In the district court action, the SSA

24  stipulated to remand Hejja's claim.  (Def. Ex. BN.)  The SSA then consolidated Hejja's two

25  applications, and the matters were heard by ALJ Steinman on May 3, 2005.  (Def. Ex. BO.)  Hejja,

26  who continued to be  represented by attorney Mary Mitchell, amended his disability onset date to May

27  1, 2001.  (*Id.* at 2.)  On June 6, 2005, ALJ Steinman issued a favorable decision using the amended

28  disability onset date.  (*Id.* at 4.)

*Vien Mai*. Vien Mai filed applications for supplemental security income on June 14, 1994 and January 14, 1999, respectively, both of which were denied by the Agency. (Zuroff Decl. ¶ 16.) On May 2, 2000, Mai filed another application for supplemental security benefits. (*Id.* at ¶ 17.) Mai had a hearing on that application in front of ALJ New on August 30, 2001, at which time she was represented by attorney Michael Earle. (*Id.* at 17; Def. Ex. C.) ALJ New denied Mai's application on November 26, 2001. (Def. Ex. C.) Mai did not appeal the decision. (Zuroff Decl. at ¶ 19.) On February 19, 2002, Mai filed another application, which was denied by the Agency. (Def. Ex. D.) On September 22, 2005, Mai filed yet another application for disability benefits. (Def. Ex. E.) It was denied by the Agency at the initial and reconsideration stages. She appealed the decision and thereafter attended a hearing in front of ALJ Godfrey, at which time she was represented by attorney Josephine Arno. (*Id.*) ALJ Godfrey issued a fully favorable decision, finding that Mai's condition had worsened since ALJ New's decision and that Mai was entitled to benefits with a disability onset date of September 22, 2005. (*Id.* at 1-2.)

## III.

## LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where there is an absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett,* 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). There is no genuine issue of material fact when a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 325. A complete failure of proof of an essential element of a case renders all other facts immaterial. *Id.*

Summary judgment should be granted if the evidence is such that it would require a directed verdict for the moving party. *Anderson*, 477 U.S. at 251. When making its determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the party

opposing the motion. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Rather, the judge's function is to determine whether there is a genuine issue for trial. *Id.* at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*

In light of *Anderson* and *Celotex*, it has been stated:

> These cases, proceeding from the premise that Rule 56 is intended to avoid unnecessary trials, establish that the test of a dispute is whether a reasonable jury could find for the nonmovant. That, in turn, means that the facts in the nonmovant's opposition, if proved at trial, would have to be sufficient to support a verdict – in other words, sufficient to survive a motion for directed verdict or judgment notwithstanding the verdict. In the absence of such a showing, a trial would be pointless.[2]

## B.   Bias

Due process requires that hearings be conducted by an impartial adjudicator. *Schweiker v. McClure*, 456 U.S. 188, 195-196 (1982). Administrative law judges are presumed to be impartial. *Id.*; *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999). The presumption can be rebutted by showing a conflict of interest or some other specific reason for disqualification. *Schweiker*, 456 U.S. at 195; *Verduzco*, 188 F.3d at 1089. The party challenging an ALJ's impartiality bears the burden of rebutting the presumption. *Schweiker*, 456 U.S. at 195; *Verduzco*, 188 F.3d at 1089.

Bias is not shown by "expressions of impatience, dissatisfaction, annoyance, [or] even anger." *Rollins v. Massanari*, 261 F.3d 853, 857-858 (9th Cir. 2001) (citing *Liteky v. United States*, 510 U.S. 540, 555-556 (1994)). Rather, bias is shown where the ALJ's conduct, in the context of the entire proceeding, is "so extreme as to display clear inability to render fair judgment." *Id.* Due process is not violated where, although isolated incidents are challenged, the record as a whole shows

---

[2] Schwarzer, Hirsch & Barrans, *The Analysis and Decision of Summary Judgment Motions*, Federal Judicial Center (1991), at 45.

1   fundamental fairness to the litigant. *Bayliss v. Barnhart*, 427 F.3d 1211, 1215-1216 (9th Cir. 2005).[3]

2   **IV.**

3   **DISCUSSION**

4   Multiple legal issues are raised in the pending motions for summary judgment. Plaintiffs'

5   motion addresses the merits of their bias claim. Plaintiffs argue they are entitled to summary judgment

6   because: (1) ALJ New was terminally ill with cancer and thus, could not be fair to claimants with

7   lesser disabilities;[4] (2) ALJ New was intemperate, rude and demeaning, thus revealing a general

8   animus towards social security claimants; and (3) claimants were traumatized by Judge New's conduct

9   and thus, discouraged from appealing.[5] Defendant, on the other hand, argues that "some of the

10   representatives are time-barred, some failed to exhaust their administrative remedies with the Agency,

11   some already lost individual § 405(g) actions in federal court, some have already received the remedy

12   they seek in this action (a new hearing before a new ALJ), and some developed a worsening medical

13   condition over time and therefore received benefits under a subsequent application filed with the

14   Agency." (*See* Def. Mem. P. & A. Vien Mai at 1.) Defendant further argues that "in all instances ...

15   Judge New was in no way 'biased' against these individuals and that substantial evidence supported

16   the denial of each class representative's claim at the time he reviewed them." (*Id.*)

17   **A.    Prior Rulings of the Court**

18   A number of matters previously were raised by, and decided against, Defendant by Judge

19   Jones, including, but not limited to: (a) the Court's "jurisdiction" to take new evidence on the class

20

21      [3] Plaintiffs' argument that *Sims v. Apfel*, 530 U.S. 103 (2000) applies, rather than *Liteky v. United States*, 510 U.S. 540 (1994), is unavailing. The Ninth Circuit has applied *Liteky* when

22   addressing claims of bias against an ALJ. *See Rollins v. Massanari*, 261 F.3d 853, 857-858 (9th Cir. 2001); *Bayliss v. Barnhart*, 427 F.3d 1211, 1215-1216 (9th Cir. Or. 2005). *Sims* is distinguishable as

23   it addresses exhaustion of administrative remedies, not claims of bias. 530 U.S. at 111-112. Similarly unavailing is Plaintiffs' argument that they need only show an "appearance of impropriety" to establish

24   bias. The appearance of impropriety standard applies to recusal of federal judges. *Bunnell v. Barnhart*, 336 F.3d 1112, 1115 (9th Cir. 2003). Disqualification of administrative law judges, on the

25   other hand, requires a showing of actual bias. *Id.*

26      [4] The Court assumes for purposes of this motion that ALJ New did, in fact, have cancer toward the end of his career.

27

28      [5] Defendant has filed evidentiary objections to much of Plaintiffs' evidence. The Court declines to rule on the objections (unless specifically addressed below), and assumes Plaintiffs' evidence is true and admissible for purposes of this motion.

- 8 -                                                                                04cv2039

members' claims when the statutory scheme under 42 U.S.C. § 405(g) precludes the district court from making factual findings or taking evidence of "bias" without first affording the SSA the opportunity to do so, (b) failure to exhaust administrative remedies, and (c) statute of limitations and equitable tolling. (*See generally* March 5, 2007, January 29, 2008 & April 9, 2009 Orders.) The issues regarding exhaustion of administrative remedies and equitable tolling are interrelated as they hinge on Plaintiffs' claim of bias on the part of ALJ New. Plaintiffs successfully argued they were unaware of such generalized bias and thus, they should be excused from exhausting administrative remedies and the 60-day statute of limitations should be equitably tolled. Judge Jones agreed with Plaintiffs, but invited Defendant to renew these arguments after completion of discovery. (*See* March 5, 2007 Order at 9 n.3 ("However, the Court's finding, in and of itself, does not preclude future arguments that claimants should be time barred.").) With the close of discovery, Defendant has renewed his argument, contending there is no evidence warranting equitable tolling or waiver of administrative exhaustion requirements. The Court agrees, and addresses these interrelated issues next.[6]

_____A social security claimant has sixty days in which to appeal an ALJ's decision to the SSA's Appeals Council. 20 C.F.R. § 404.968. Once the Appeals Council acts, the claimant has sixty days in which to seek judicial review from the district court. 42 U.S.C. § 405(g). The sixty day requirements for initial exhaustion of administrative remedies and for filing in district court are subject to equitable tolling. *Bowen v. City of New York*, 476 U.S. 467, 479-80 (1986). In this case, when the class initially was certified, it included "all claimants...who had their claims denied or dismissed by ALJ New, with the exception of claimants whose claims are barred under 42 U.S.C. § 405(g)." (Aug. 17, 2006 Order at 9-10.) That definition excluded most of the potential class members.

Plaintiffs therefore moved to modify the class definition by removing the exception for claimants whose claims were time-barred. In their motion, Plaintiffs argued that the statute of limitations should be equitably tolled because class members had no reason to know that ALJ New

---

[6] Defendant also preserved his jurisdictional argument for any appeal, but did not renew the argument in the present motions: "Defendant has already filed previous motions in this case explaining that there is no jurisdiction for the district court to take new evidence on the class members' claims because the applicable statutory scheme (specifically § 405(g)) does not allow the district court to make factual findings or take evidence of 'bias' without first affording the Agency the opportunity to do so. ...[T]his Court lacks jurisdiction to ... take evidence, and hold the very first trial that will have ever occurred in a § 405(g) district court case." (*See* Def. Mem. P. & A. Vien Mai at 1.)

was predisposed to deny their claims due to bias.  Plaintiffs further argued that many class members likely were unaware of the statute of limitations because they were not represented by counsel, did not understand English, or were adversely affected by other factors beyond their control.  Defendant pointed out Plaintiffs had alleged that ALJ New conducted himself with an open and obvious bias, so they should have been immediately aware of any bias.  (March 5, 2007 Order at 9.)

While Judge Jones acknowledged that Defendant's argument may prove meritorious, he agreed with Plaintiffs that "[i]f many of the unnamed claimants were unrepresented and/or the ALJ exhibited a predisposed bias against claimants, Plaintiffs may be able to establish that 'none of the individual members of the proposed class could have been aware of such generalized bias at the time of the hearing' and thus the limitations period should be tolled."  (*Id.*)  Accordingly, the Court partially granted Plaintiffs' motion to allow Plaintiffs the "opportunity to delineate a further factual basis for equitable tolling."  (*Id.*)  The Court applied the same reasoning for waiving the exhaustion requirement as to Plaintiffs' claims.  (April 9, 2009 Order at 10.)

Equitable tolling is appropriate when "the equities in favor of tolling the limitations period are 'so great that deference to the agency's judgment is inappropriate.'"  *Bowen*, 476 U.S. at 480.  In *Bowen*, the Supreme Court permitted equitable tolling because a secret internal policy of the SSA, involving a presumption that was applied to psychiatric assessments, caused a procedural irregularity that resulted in legitimate claims being denied.  *Id.* at 473, 480-81.  Equitable tolling was warranted because the "Government's secretive conduct prevent[ed] plaintiffs from knowing of a violation of [their] rights."  *Id.* at 481.  Equitable tolling is not appropriate, however, where claimants should have been aware of the basis of their claim.  *See Johnson v. Shalala*, 2 F.3d 918, 923 (9th Cir. 1993).

Similarly, exhaustion of administrative remedies may be futile where the challenge is to a systemwide policy rather than to individual findings.  *Johnson*, 2 F.3d at 922.  Exhaustion is required, however, where the focus is on individual irregularities in an agency proceeding.  *Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003).  The purpose of exhaustion is to "allow[] the agency to compile a detailed factual record and apply Agency expertise in administering its own regulations.  The requirement also conserves judicial resources."  *Id.* (citation omitted.)

/ / /

Here, Plaintiffs do not allege a secret Agency-wide policy that prevented them from receiving a fair hearing. Rather, Plaintiffs allege bias on the part of a particular Judge. While Plaintiffs also argue that the SSA had a secret policy of hiring ALJs with cancer for the San Diego office so they could receive medical treatment, they have provided no evidence to support such a claim.[7] Further, even if such a policy existed, the fact that an ALJ has cancer – even terminal cancer – does not reasonably lead to the conclusion that he or she is predisposed to deny legitimate claims or arbitrarily violate social security claimants' rights. Simply to state this proposition reveals its preposterousness.

Plaintiffs' principal argument is that they are entitled to relief because they were unaware of ALJ New's bias at the time of their hearings. Plaintiffs, however, as discussed in more detail below, base their bias claims entirely on Judge New's *conduct during hearings* in which they themselves were present. They contend he questioned claimants in a leading manner to obtain uninformed admissions; subjected claimants to lengthy questioning to extract inconsistent answers; screamed and yelled at claimants to intimidate them to cause confusion and prevent them from providing testimony favorable to their cases; used up the entire hearing time to cross-examine claimants so little or no time was left for claimants' counsel to develop favorable testimony; interrupted and brutally cut off expert witnesses and family members; openly disparaged claimants' treating physicians; debased and cut-off claimants' counsel; ignored the law; and disregarded evidence of mental impairment.

Although Plaintiffs claim generalized bias by Judge New, their complaints amount to individual irregularities in hearings at which they were present. The conduct ascribed to Judge New could have been raised in individual appeals, as it occurred in claimants' presence. Stated differently, Plaintiffs' bias claim is premised upon Judge New's *public* conduct; Plaintiffs have introduced no evidence of bias based on Judge New's *off-record* conduct. Though equitable tolling has been applied to claims of bias in early stages of litigation, s*ee Small v. Sullivan*, 820 F. Supp. 1098, 1104-06 (S.D. Ill. 1992) and *Kendrick v. Sullivan*, 784 F. Supp. 94, 105-06 (S.D.N.Y. 1992), Plaintiffs here were

---

[7] Plaintiffs submitted the deposition testimony of Mary Mitchell, a former SSA employee, who "heard people talk about how all the ALJs want to come to San Diego, to transfer to San Diego. . .and that a lot of them get it for medical reasons." (Mitchell Dep. 52:21-25.) The testimony of Ms. Mitchell is inadmissable hearsay. In addition, there is no evidence that any ALJs were actually transferred to San Diego for medical purposes. In fact, ALJ New's transfer approval document states that he requested the transfer to care for his son. (Def. Ex. 1.)

1  given the opportunity to conduct discovery, and after doing so, have failed to show that the conduct

2  attributed to ALJ New could not have been raised in individual appeals within the limitations period.

3       Relatedly, Plaintiffs have failed to establish that claimants did not know of their right to appeal.

4  When a claimant receives an unfavorable decision, notice is provided of their right to appeal to the

5  Appeals Council and the district court, as well as the time limit for doing so.  There is no claim that

6  any of the Plaintiffs in this case did not receive such notice.  Instead, Plaintiffs argued previously that

7  many claimants were likely unaware of the statute of limitations because they were unrepresented or

8  did not speak English.  Following discovery, however, Plaintiffs have failed to establish how many

9  claimants were unrepresented, how many did not speak English, and whether any of them did not

10  understand their appellate rights.[8]

11       Relief from administrative exhaustion requirements or the applicable statutes of limitation is

12  not warranted based on the well developed record before the Court.  Nonetheless, because Defendant

13  concedes that not all claimants are time-barred, (Def. Mem. P. & A. Vien Mai at 1-2), the Court

14  addresses Plaintiffs' bias claim on the merits.  That claim applies to all claimants and is therefore

15  dispositive.

16  **B.    Bias Claim Against ALJ New**

17          1.    *Plaintiffs' Motion*

18                a.    *Cancer*

19       Plaintiffs argue ALJ New was biased because of his cancer and failing health.  Plaintiffs'

20  evidence of bias rests in large measure on the deposition testimony of Shelly Ramos, a former SSA

21  computer assistant who assisted ALJ New with computer issues.  She testified that she was bothered

22  by the fact that ALJ New had terminal cancer.  (Ramos Dep. 23:15.)  When asked why she was

23  bothered, Ms. Ramos answered, "It just did bother me.  Because if he was terminally ill and – in my

24  opinion, I didn't understand how he could hold hearings for people that had other disabilities."  (*Id.*

25  at 23:15-18.)  Ms. Ramos was never personally present at any hearing, never saw Judge New with any

---

26

27       [8] Notably, limited linguistic and legal experience – even if proven– do not in any event toll the
    limitations period in the absence of showing "extraordinary circumstances," such as where the plaintiff
    has no reasonable way of discovering the wrong perpetrated against him or her. *See Jackson v. Astrue*,
28  506 F.3d 1349, 1356 (11th Cir. 2007).  For the reasons set forth above, Plaintiffs have failed to
    produce any such evidence.

1    claimant, and was not aware that Judge New ever acted inappropriately toward any claimant or

2    employee.  (*Id.* at 22:8-16; 23:13-18.)  Ms. Ramos' opinions regarding whether ALJ New should

3    continue to work despite his cancer does not raise a triable issue of fact as to whether ALJ New was

4    biased toward claimants.[9]

5              b.   <u>*Judicial Temperament*</u>

6        Plaintiffs base their claim of judicial intemperance on the testimony of attorneys and one

7    claimant who appeared before Judge New.  The testimony is summarized as follows.

8        Attorney Abraham Levy, who had roughly 30 cases in front of ALJ New, testified that Judge

9    New had "...a distinctly aggressive questioning mannerism about him.  He would initiate the questions.

10   He would also interrupt counsel or the claimant fairly freely.  So the record tended to be kind of a

11   jumble.  But that was something he did all the time.  His – the denial rate was fairly high on these

12   cases. . . ."  (Levy Dep. 22:20-25.)  Levy also testified that he could not recall any specifically

13   noteworthy events from any hearing and could not recall whether New ever said any harsh or unkind

14   words to claimants.  (*Id.* at 26:18-28:25.)

15       Manuel Serpa, who estimated he had dozens of cases in front of ALJ New, testified that ALJ

16   New was "consistently abusive to both counsel and claimants" and that he "frequently would yell at

17   claimants, [and] interrupt claimants and counsel."  (Serpa Dep. 12:9-13; 25:20-26:2.)  There was also

18   one occasion on which Serpa felt New interfered with his cross-examination of a medical expert by

19   cutting off the questioning.  (*Id.* at 26:2-7.)  On that occasion, however, Serpa remembered thinking

20   later that he could have handled the questioning better such that New would not have ended the cross-

21   examination.  (*Id.* at 28:9-29:6.)  Serpa could not recall specifically what New said when he yelled or

22   the name of any claimant at whom New yelled.  (*Id.* at 29:18-30:13.)  When asked whether he agreed

23   with Plaintiffs' allegation that Judge New was biased, Serpa responded "I don't have enough

24   information to come to a conclusion on it."  (*Id.* at 23:8-13.)

25       David Shore testified that Judge New "became more difficult over time; in other words, it was

26   as his health deteriorated or when he was having episodes that his health deteriorated.  It seemed like

27

28       [9] Plaintiffs also claim that ALJ New acted intemperately because of his illness.  That argument is addressed below.

- 13 -                                                04cv2039

his decisions were tougher." (Shore Dep. 31:21-25.) Shore remembers Judge New "chewing him out" on one occasion, but does not remember any specifics from the incident. (*Id.* at 35:4-14.) On other occasions he remembered Judge New being "very pleasant." (*Id.* at 29:19-24.) Shore also testified that he never felt like his clients did not receive a fair hearing. (*Id.* at 31:13-25.) He "felt that Judge New was an intelligent man and had a good grasp of the law. I thought from the standpoint of being a good judge in that sense [New] was." (*Id.* at 30:1-3.) When asked whether he agreed with Plaintiffs' allegations that New was biased against all disability claimants, Shore responded: "No, I don't. Again, I don't agree with that based on my experience. I don't know what went on at other people's hearings. He could be difficult, but there are a lot of judges that are difficult." (*Id.* at 46:17-47:1.)

The remaining attorney testimony is similar: ALJ New yelled and had poor judicial temperament from time-to-time. None recalled specific hearings, claimants, or incidents with any particularity.

Plaintiffs also point to claimant Julie Somo's hearing to argue Judge New questioned her improperly, disparaged her attorney, and prevented family members from providing favorable testimony. Ms. Somo's attorney was so incensed after the hearing that she lodged a complaint with the Chief ALJ. (Pl. Ex. O.) Defendants note that claimant Somo herself, prior to the hearing in front of Judge New, had been investigated by the SSA on suspicion of "feigning a mental condition." (Def. Ex. 5.) While that investigation did not result in a finding of fraud, it was suspended because Ms. Somo's husband threatened the investigators. (*Id.*) Ms. Somo's husband also insisted on acting as her translator, to the point where he apparently verbally abused an interpreter who was present to interpret for Ms. Somo at her doctor's appointment. (Def. Exs. 2-4.)

A review of the hearing transcript does not reveal the improprieties described by Ms. Somo. For example, Plaintiffs argue that New openly disparaged the claimant's treating physician; yet, the transcript shows that Judge New was concerned with the physician's opinion because Ms. Somo's husband served as the translator. (Somo Hearing, 21:24-22:13.)[10] Judge New also kept the record

---

[10] Judge New: Her husband has always been the interpreter when she went to Dr. Henderson; is that correct?

Somo: Yes, because I don't know English.

open for one week after the hearing to allow Ms. Somo to file additional medical evidence in support of her claim.  (*Id.* at 59:5-16.)  Plaintiffs also argue Judge New "questioned applicants in a leading manner to obtain uninformed admissions."  Yet the transcript reflects that Judge New was simply questioning Ms. Somo about whether she drove a car.  There is no evidence that the purpose of this questioning was to "obtain uninformed admissions."

### c.   *Traumatized Claimants*

Plaintiffs argue that ALJ New's hearings "were so brutal and humiliating that many claimants never appealed nor reapplied."  (Pl. Mem. P. & A. at 22.)  In support, Plaintiffs submit an affidavit from claimant Yvonne Mittie, who states: "I was so traumatized and humiliated by ALJ New's attitude that I gave up further attempts to apply for disability benefits." (Mittie Aff.)  Ms. Mittie's attorney, however, testified that although he believed his client was disabled, he did not leave the hearing believing Judge New was biased.  (Shore Dep. 51:14-21.)  Plaintiffs have produced no evidence of any other claimant who abandoned appeal because of conduct attributed to Judge New.

### 2.   *Defendant's Motions*

As to each class representative, Defendant argues there is insufficient evidence of bias. Plaintiffs respond with arguments addressing each class representative and the class as a whole.

### a.   *Vien Mai*

Mai testified that Judge New inappropriately questioned her English proficiency, did not sufficiently inquire about  the medications she was taking, disagreed with her level of education, and his attitude "caused [her] to lose [her] calmness." (Mai Dep. 35:18-36:24.)  Mai's attorney, Michael Earle, testified that he did not remember Mai's hearing or ever thinking Judge New was biased or did anything inappropriate during a hearing, and that he never had a problem with Judge New not admitting evidence.  (Earle Dep. 10:25-11:17, 21:11-21:24, 25:9-25:12.)

/ / /

---

Atty: Judge, (inaudible) I'd like to – I can wait if you'd like, but I – I'd like to enter a question that would clarify why using an interpreter has been a sensitive issue to my client.

Judge New: (Inaudible) there's sensitive issue to say it goes to credibility of him, the reliability of who – of the – of the analysis or evaluation or conclusions of the doctor.  We've got a – husband, who has a decided interest in this matter, interpreting the responses and the questions to his wife. (Somo Hearing, 21:24-22:13.)

04cv2039

1    Plaintiffs argue that Mai did not receive a fair hearing because an SSA employee fraudulently

2    replaced a paper in Mai's application which affected her education level.  Plaintiffs assert Judge New

3    perpetrated the fraud by relying on the paper.  There is no evidence, however, to support the claim that

4    the paper was fraudulent.  Further, even if the paper was fraudulent, no evidence exists that Judge New

5    knew it was fraudulent.  Plaintiffs also argue that Mai was *pro se*, but the record reflects that she was

6    represented at the hearing by attorney Michael Earle.  (Def. Ex. C.)  Plaintiffs argue that Mai's case

7    should be viewed in conjunction with other cases, such as claimants Thang Nguyen and Hoa La.

8    However, Thang Nguyen and Hoa La's claims are barred by res judicata.  *La v. Barnhart*, 03cv1375

9    W (AJB) (S.D. Cal. Feb. 4, 2004) (finding claims of Thang Nguyen and Hoa La time barred); *see*

10   March 5, 2007 Order at 6 (noting that the *La* case has res judicata effect on the individuals that were

11   parties in that matter).

12                  b.    *Ethel Gutierrez*

13   Gutierrez testified that Judge New seemed angry.  (Gutierrez Dep. 64:1-6.)  He made Gutierrez'

14   attorney, Anthony DeLellis, appear incompetent even though Gutierrez believed Mr. DeLellis was a

15   good attorney.  (*Id.* at 64:7-65:9.)  Judge New did not say anything rude or inappropriate to Gutierrez,

16   only to her attorney.  (*Id.* at 67:22-25.)  Mr. DeLellis testified that he remembered a hearing in which

17   Judge New was very mad, but could not say for sure it was Gutierrez' hearing.  (DeLellis Dep. 24:10-

18   18.)  When asked whether he agreed with Plaintiffs' claims of bias, DeLellis testified: "...I don't have

19   information that he was biased against all claimants.  I think near the end of his career he was a little

20   cranky, is about how I would describe it.  And I was kind of surprised at a couple of hearings, his tone

21   toward me.  And then I learned that he was ill and I kind of chalked it up to that."  (*Id.* at 24:1-8.)

22   Plaintiffs argue that Gutierrez, who previously had attempted suicide before her hearing with

23   Judge New, made a second suicide attempt because of ALJ New's rude treatment.  But no evidence

24   is submitted to support that claim.  Plaintiffs further argue that Judge New disregarded evidence of

25   Gutierrez' mental illness.  His decision, however, states that he found Gutierrez to be suffering from

26   depression, causing her mild to moderate limitations.  (Def. Ex. M at 13.)  Although Plaintiffs believe

27   Gutierrez suffered from severe mental illness, Gutierrez' history with the SSA reveals conflicting

28   evidence regarding the extent of her mental illness, which resulted in a second hearing before ALJ

Carletti.  (Def. Ex. N.)

Plaintiffs further argue that Judge New had a pattern of manipulating evidentiary and procedural rules in cases of mental illness, as evidenced by other cases in which the Judge's decisions were overturned.  *See, e.g., Hillenbrand v. SSA*, 02cv639 H (AJB) (S.D. Cal. 2002).  While it is true that some of ALJ New's decisions were overturned, some were upheld.  *See, e.g., Doan v. Astrue*, 237 Fed. Appx. 246 (9th Cir. 2007).  Significantly, however, Plaintiffs fail to provide any evidence regarding how many of the Judge's cases were overturned and on what grounds.  With over 800 potential claimants, evidence that 6 or 7 cases were overturned does not raise a triable issue that Judge New was predisposed to deny claims based on bias.  (*See* Pl. Opp'n Gutierrez at 21-22 (collecting cases).)

c.      Hoa Nguyen

Hoa Nguyen testified ALJ New was unfair because the Judge thought she was not truthful; he felt she could walk longer than she claimed; and he disagreed with the extent of her eye illness.  (Nguyen Dep. 43:8-25.)  Nguyen was represented at the hearing by Michael Earle, the same attorney who represented Vien Mai.  As discussed above, Mr. Earle does not recall thinking Judge New was biased or ever acted inappropriately.  (Earle Dep. 9:19-10:5, 10:25-11:17, 21:11-21:24, 25:9-25:12.)  Judge New's decision was upheld by the district court.  *See Nguyen v. Barnhart*, 02cv0329 JM (LSP) (S.D. Cal. 2002)(ALJ decision supported by substantial evidence).

Plaintiffs also claim Judge New failed to develop the record; however, the transcript from the Nguyen hearing belies that assertion.  The ALJ left the record open for two weeks after the hearing to allow Nguyen to file additional evidence.  (Nguyen Hearing at 18.)  While Plaintiffs argue Nguyen submitted additional evidence after the hearing and it did not change the outcome, Judge New's decision was found to be supported by substantial evidence.  Finally, Plaintiffs claim that "Legal Aid Society attorneys had filed numerous complaints against ALJ New."  Yet the evidence reveals only two formal complaints, those of attorney Ann Menasche and a law student, which were lodged after claimant Julie Somo's hearing.  (Pl. Ex. O.)

/ / /

/ / /

d.   _Karen Kraintz_

Karen Kraintz testified that Judge New was extremely inappropriate in her hearing because he constantly screamed and yelled at her and her attorney, he accused them both of lying, and he refused to admit evidence.  (Kraintz Dep. 56:6-27:24, 60:24-62:2, 64:23-65:8.)  A review of the hearing transcript, however, shows that Judge New never accused her of lying.  Rather, he questioned some inconsistences in her testimony.  For example, she testified that she could not bend or stoop, but she had previously testified that she could drive a car.  Judge New noted "...unless you have some unusual car, I don't see how you can get in and out of a car without bending and stooping."  (Kraintz Hearing at 55.)  The evidence Judge New refused to admit was a medication list that was not submitted on the proper form.  (_Id._ at 3-5.)  He returned the list to counsel and directed him to submit it on the proper form.  (_Id._ at 5.)  Judge New also asked the attorney if there were any additional documents he needed to consider, either now or in the future, to which the attorney responded, "No."  (_Id._ at 13.)

Kraintz' attorney, Vincent Jackson, did not remember the hearing.  (Jackson Dep. 12:9-18.)  He could not give an opinion as to whether Judge New was biased toward claimants.  (_Id._ at 22:14-21.)  He recalled generally that Judge New "was a stickler for procedural matters and he raised his voice a lot.  But to say that he was biased, I couldn't say that."  (_Id._ at 23:2-4.)  Judge New's decision denying Kraintz' benefits was upheld on appeal.  _See Kraintz v. Barnhart_, 04cv1708 DMS (JMA) (S.D. Cal. 2004).

Plaintiffs also argue Judge New debased Kraintz' attorney during the hearing the same way he did with Julie Somo's attorney.  Indeed, Judge New referred to counsel's failed attempt to admit the medication list as "unprofessional."  (Kraintz Hearing at 5.)  Plaintiffs, however, fail to explain why this exchange shows Judge New was predisposed to deny claims against all social security claimants.

e.   _Shelby Mittner_

Shelby Mittner's mother, Amy Garcia, testified that Judge New insulted her daughter by calling her retarded and that he was generally rude.  (Garcia Dep. 18:2-19:19.)  The hearing transcript does not reflect that Judge New ever insulted Ms. Mittner.  Ms. Garcia testified Judge New was unwilling to accept additional documents after the hearing.  (_Id._ at 21:24-22:4.)  However, the hearing transcript shows that he left the record open after the hearing to allow Ms. Garcia to fax over documents she had

failed to bring with her.  (Mittner Hearing at 4, 25.)

Plaintiffs further argue that Judge New violated his duty to assist *pro se* claimants by failing to obtain Ms. Mittner's IEP.  Yet, the transcript shows Judge New learned about the IEP when he asked claimant if she had additional documents to admit, and he afforded her an opportunity to fax over the document following the hearing.  (Mittner Hearing at 4, 25.)

Plaintiffs next argue Judge New should have known Ms. Garcia was not adequately representing Ms. Mittner at the hearing.  Yet, Judge New told her she was allowed to retain counsel and she acknowledged that she was proceeding without one.  (*Id.* at 5-6.)

Finally, Plaintiffs argue the SSA engaged in a cover-up of the ALJ's conduct by later granting benefits only after claimant amended her disability onset date.  (Pl. Opp.'n Mittner at 11-15.)  Yet, the amended disability onset date stemmed from the onset of schizophrenia following claimant's hearing.  (Garcia Dep. 31:20-32:12; 33:12-34:5.)

> f.    <u>Sandor Hejja</u>

Sandor Hejja testified that Judge New was uncaring and did not pay attention to the medical evidence.  (Hejja Dep. 25:13-26:14.)  Mr. Hejja, however, did not recall Judge New every saying any harsh words to him or refusing to accept evidence.  (*Id.* at 27:13-20; 27:23-28:5.)  Plaintiffs also accuse the SSA of a cover-up to hide Judge New's inappropriate conduct, but there is no evidence to support this claim.

> g.    <u>Statistical Evidence</u>.

Plaintiffs argue that ALJ New had a higher denial rate than other ALJs in the United States. As discussed in detail in this Court's January 12, 2010 Order, Plaintiffs retained an expert who opined that there was a statistically significant variance in Judge New's allowance rate as compared to a national rate.  In 1999, Judge New's allowance rate, including dismissals, was 36.3%, compared to 57.6% nationally.  In 2000, it was 38.6% compared to 57.6% nationally; in 2001, 34.1% compared to 60.1% nationally; and in 2002, 43.9% compared to 61% nationally.  The numbers change slightly when dismissals are excluded.  In that instance, Judge New's 1999 rate was 42.4%, compared to 63% nationally.  In 2000, it was 45.6%, compared to 65.8% nationally; in 2001, 40.1% compared to 68.4% nationally, and in 2002, 48.4% compared to 69.8% nationally.  (Doc. 298-23; Lackritz 3 at 4.)

1   Plaintiffs argue these statistics establish, or at least create an inference, that ALJ New was biased.

2        3.        *Collective Review of Evidence*.

3        Upon review of all the evidence presented by Plaintiffs in their motion for summary judgment

4   and in their oppositions to Defendant's motions, and viewing that evidence most favorably to

5   Plaintiffs, there is insufficient evidence to support a claim for bias. Two cases involving claims of ALJ

6   bias are instructive, as they demonstrate the type of evidence relied upon by district courts to grant

7   relief where bias of a particular ALJ against social security claimants is asserted.

8        In *Grant v. Comm'r SSA*, 111 F. Supp. 2d 556 (M.D. Penn. 2000), the court, after detailing the

9   evidentiary findings of two special panels of the SSA Appeals Council, found that the ALJ in question

10  held a general bias against social security claimants, violated Plaintiffs' rights to full and fair hearings

11  as result of his biases, and ordered new administrative hearings for each member of the class. In

12  chronicling the special panels' findings, the court noted, *inter alia*, the following: the ALJ had

13  previously stated it was too easy for claimants to obtain social security benefits; he was highly critical

14  of certain groups, such as claimants who had filed personal injury claims or had been involved in car

15  accidents, and labeled such claimants as "no-goodnicks," employing that label hundreds, if not

16  thousands, of times; he treated "no-goodnicks" unfavorably and assumed their testimony was

17  unreliable; he believed certain ethnic groups often faked mental illness, and used racial slurs from

18  time-to-time when referring to them; he informed an attorney he would deny certain claims regardless

19  of the evidence. *Id.* at 559-61. Statistical evidence also was marshaled from an in-depth analysis of

20  over 200 of the ALJ's cases. *Id.* at 558-559. The statistics showed that 69 of the ALJ's written

21  opinions involved "problematic" credibility determinations, including 32 cases in which the ALJ

22  clearly misapplied the law. *Id.* at 567.

23        In *Pronti v. Barnhart*, 339 F. Supp. 2d 480, 497 (W.D.N.Y. 2004), the court, after reviewing

24  evidence submitted by plaintiffs of bias on the part of a particular ALJ, found the evidence sufficient

25  to remand to the SSA "to take additional evidence regarding the claim that reversal is required because

26  of ALJ Russell's general bias." The court noted evidence that the ALJ had "declared before counsel

27  that too many claimants were awarded social security benefits and that he was going 'to protect the

28  public treasury'" *Id.* at 493. On another occasion, the ALJ declared himself the "guardian of the Social

Security Trust Fund." *Id.* Six attorneys submitted affidavits attesting that the ALJ, "uses an illegal standard of proof for disability that is higher than a preponderance of the evidence, ... and constantly misapplies the law." *Id.* The attorneys further claimed that the ALJ, "routinely misapplies the Treating Physicians's Rule and uses an illegal standard to determine credibility, often finding inconsistencies in claimant's testimony when none exist." Several attorneys claimed that the ALJ refused "to allow them to make objections on the record or to submit exhibits." *Id.* In addition, the attorneys filed statistical evidence that the ALJ denied 63.4% of the cases assigned to him, while ALJs nationwide denied 33.7% of their cases and ALJs in the region denied 43% of their cases. One attorney stated the ALJ found the claimant not credible in 82% of his cases. *Id.* at 494 n.9. Another found that in two-thirds of the cases in which the ALJ denied benefits, the claimant later received benefits either after remand by the Appeals Council or on subsequent application. *Id.* at 494 n.10.

In *Grant* and *Pronti*, the plaintiffs presented both direct and circumstantial evidence of bias: admissions by the ALJ indicating generalized bias or predisposition against social security claimants generally and certain groups specifically (*e.g.* "no-goodnicks," racial epithets, "protect the public treasury," "guardian of the Social Security Trust Fund," pronouncement to deny certain claims regardless of evidence); percipient testimony from attorneys regarding the ALJ's regular use of incorrect law and improper legal standards and assumptions to determine disability and credibility; and statistical evidence demonstrating not only the ALJ's denial rate *vis-a-vis* national and regional averages, but specific evidence as to the number of cases in which (a) claimants received benefits after remand or on subsequent application, or (b) problematic credibility determinations were made or clear misapplication of law resulted. The courts in *Grant* and *Pronti* took action only after considering objective, admissible direct and circumstantial evidence of bias with respect to a particular ALJ.

Here, Plaintiffs submit statistical evidence that ALJ New had a higher-than-average denial rate. However, there is nothing that links those statistics to bias. Although Plaintiffs argue that Judge New continually misapplied the law and treated *pro se* claimants unfairly, their statistics do not show how many of Judge New's cases were overturned, whether Judge New continually misapplied the law, how many problematic credibility determinations were made, or how many *pro se* claimants appeared before him. While Plaintiffs submitted the deposition testimony of several attorneys, the testimony

fails to create a triable question of fact because it is uniformly conclusory and speculative, and fails to contrast asserted denial rates with reversals on appeal, problematic credibility determinations, or misapplication of law.  For example, attorney Abraham Levy testified he had about 30 cases with Judge New and he thought the Judge had a high rate of denials and the Appeals Council remanded a lot of his cases, but he did not have records and thus, had "no way of testifying to an overall percentage of how much he denied versus how many he granted."  (Levy Dep. at 24:9-22.)  Attorney Matty Sandoval testified he had 100 to 200 cases before Judge New with favorable decisions in less than 10% of the cases, but he purged all his files, had no records with him, and provided – like attorney Levy – no contrasting statistical information.  (Sandoval Dep. at 14:12-16:21.)

Thus, the statistical evidence provided by Plaintiffs has little, if any, probative value because it is not moored to reversal rates or any other objective standard that properly would allow a trier of fact to draw an inference of bias.  In other words, it may be that Judge New's denial rate – while higher than the national average for certain years – reflects nothing more than *correct* disability determinations and that his denial rates were higher than the national average simply because of the unique mix of cases he adjudicated at that time.  Conversely, the higher-than-average denial rates could indicate bias, but drawing that adverse inference requires speculation, particularly when there is no other direct evidence of bias (such as an admission by the ALJ that demonstrates animus toward social security claimants), or circumstantial evidence (such as testimony or statistics regarding reversal rates, routine misapplication of law, and problematic credibility determinations).  The statistical evidence, standing alone, is inadequate to establish bias.  *See Grant*, 111 F. Supp. 2d at 559 ("[S]tatistics in and of themselves may have limited probative value.").

The attorney testimony also does not establish bias.  Unlike *Pronti*, where the attorneys detailed specific incidents that circumstantially indicated bias, the attorneys here were unable to recall with particularity any hearing involving Judge New or any incident, other than general intemperance.  When the attorneys were asked about Judge New's alleged bias, they uniformly pointed to his temperament.[11]

---

[11]  The following summarizes all of the attorney testimony in the record before the Court:

Attorney Levy, when asked whether he agreed with Plaintiffs' claims of generalized bias, responded: "I would have – I'd have to say...I, in general do.  And I have to have something of a

Intemperance, however, does not equate to bias. *See Liteky*, 510 U.S. at 555-56 ("Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger."). *See also Valentine v. Comm'r SSA*, 574 F.3d 685, 690 (9th Cir. 2009) (allegations that the ALJ asked pointed questions and made expressions of disbelief during hearing do not "come[] close" to the showing required for bias); *Bayliss v. Barnhart*, 427 F.3d 1211, 1215-1216 (9th Cir. 2005) (statements that ALJ expressed displeasure with conduct of claimant's counsel does not establish bias).

Viewed as whole and most favorably to Plaintiffs, the evidence is insufficient to demonstrate Judge New was biased against claimants. Plaintiffs fail to raise a triable issue of fact that Judge New's

---

qualification to that answer....Well, the qualification is that he – when he was at Orange OAH, he had a certain disposition and temperament..." (Levy Dep. 21:22-22:25.)

Attorney Serpa: "I'm sorry I can't be more specific. There's nothing other than my general impression of him being abusive. I never made an argument that he was biased against all claimants, and I don't have enough information to really have an opinion on whether that was the case or not." (Serpa Dep. 44:12-17.)

Attorney Shore: "I don't have a memory of bias against claimants. My memory is more of a change in his judicial demeanor, depending upon his health. That's what I specifically remember." (Shore Dep. 29:3-9.)

Attorney McNeil: "I don't know if he was biased. He had a real anger, and almost like explosive. When he was questioning people, he would just start yelling. Whether that was bias or not, I don't know how you'd classify it. Bizarre behavior. That's the only way – the only word I can use. I'm used to appearing before Superior Court judges, and I have never encountered that." (McNeil Dep. 17:2-25.)

Attorney Stotland: "I don't know if he was biased. But he was certainly not impartial....It's my understanding that Social Security hearings are supposed to be nonadverserial. His hearings were adversarial." (Stotland Dep. 22:2-8.)

Attorney Sandoval, when asked to clarify his statement that Judge New appeared to be biased "against humans," stated: "He was a jerk to everybody." (Sandoval Dep. 28:2-5.)

Attorney DeLellis: "The best way I could answer that is I think that – I don't think he was, per se – at least I don't have information that he was biased against all claimants. I think near the end of his career he was a little cranky, is about how I would describe it. And I was kind of surprised at a couple of hearings, his tone towards me. And then I learned that he was ill and I kind of chalked it up to that." (DeLellis Dep. 24:1-8.)

Attorney Jackson: Well, I can't give an opinion either way. ... Well, I – based upon my experience with Judge New, I know that he was a stickler for procedural matters and that he raised his voice a lot. But to say that he was biased, I couldn't say that." (Jackson Dep. 22:20-23:4.)

Attorney Earle: "I don't really remember who he was. I don't remember ever walking out of a hearing thinking 'That guy was completely biased.' I mean it's been a long time since I have been down to the Social Security Administration. I'd have to say no, but –" (Earle Dep. 11:7-11.)

conduct was "so extreme as to display clear inability to render fair judgment."[12] *Liteky*, 510 U.S. at 555-56.  Because Plaintiffs' bias claim applies to all claimants and can be determined as a matter of law, it is dispositive of this action and all motions before the Court.

# V.

## CONCLUSION

For the reasons set forth above, the Court denies Plaintiff's motion for summary judgment and grants Defendant's six motions for summary judgment.

**IT IS SO ORDERED.**

DATED:  March 19, 2010

_____

HON. DANA M. SABRAW
United States District Judge

---

[12]  Defendant raises legitimate concerns regarding this Court's fact-finding authority.  *See Grant v. Shalala*, 989 F.2d 1332 (3rd Cir. 1993) (district court lacked authority to conduct trial and make independent findings of fact concerning ALJ's alleged bias, as such is within the province of the SSA).  Defendant raised this argument previously in a motion *in limine* to exclude evidence of bias. (Doc. 120.)  The motion was denied without prejudice pending the outcome of discovery.  (January 29, 2008 Order at 7.)  *See Hummel v. Heckler*, 736 F.2d 91, 95 (3d Cir. 1984) (discovery on issue of bias may be warranted so plaintiff can "attempt to convince the district court that a remand to the Secretary for the taking of new evidence is appropriate."); *see also Pronti*, 339 F.Supp.2d at 501 ("[P]laintiff ... has filed sufficient evidence regarding ALJ Russell's alleged bias ... to convince the Court that a remand is necessary.")  Plaintiffs' lack of evidence to support their bias claim, however, renders any remand moot.

04cv2039